# United States Court of Appeals
## For the First Circuit

No. 06-2129

UNITED STATES OF AMERICA,

Appellant,

v.

KENNY BARNES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Torruella, Circuit Judge,
John R. Gibson,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, and Zechariah Chaffee, Assistant United States Attorney, were on brief, for appellant.

Judith H. Mizner, Assistant Federal Public Defender, Federal Defender Office, District of Massachusetts, for appellee.

October 29, 2007

* Of the Eighth Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** On June 8, 2006, the United States District Court for the District of Rhode Island suppressed 34.79 grams of cocaine base seized from defendant Kenny Barnes pursuant to what the court deemed an illegal body cavity search. United States v. Barnes, 443 F. Supp. 2d 248 (D.R.I. 2006). The Government now appeals the suppression ruling. At issue in this interlocutory appeal is whether the police officers conducting the cavity search had the requisite reasonable suspicion. After careful consideration, we vacate the order and remand for further proceedings consistent with this opinion.

## I. Facts

On August 27, 2005, Barnes was sitting in the driver's seat of his illegally parked car. Police officer George McMann of the Woonsocket, Rhode Island Police Department ran the car's license plate number through the National Crime Information Center database on the laptop computer in his patrol car and found that Barnes's driver's license had been suspended. McMann approached the car and requested Barnes's license. Barnes presented documents that purportedly showed that his license had been reinstated. McMann stepped away from the car to review the documents.

Finding the documents lacking, McMann, accompanied by Lieutenant John Picard and Officer Cote, who had subsequently arrived on the scene, patted Barnes down for weapons. Finding none, they removed Barnes to McMann's patrol car. Officers McMann

and Cote recognized Barnes as the victim of a shooting that had occurred approximately one month earlier.[1]

In the course of conducting an inventory search of Barnes's car, as is customary before a car is impounded, the officers smelled a strong odor of marijuana in the vehicle and found remnants of a marijuana cigarette, including flakes of what they suspected to be marijuana, in the car's front middle console. The officers arrested Barnes, and searched the trunk of the vehicle, finding a large bag of marijuana, a smaller bag of marijuana, and a digital scale. Barnes was also found to be carrying two cellular phones and $685 in cash. The officers then radioed their station that they were bringing Barnes in, and drove to the station.

Once at the station, McMann, accompanied by an Officer Cahill, strip searched Barnes in a shower area designated as the station's strip search facility.[2] At McMann's instruction, Barnes removed his clothing and lowered his underwear around his legs. No contraband or weapons were found at that point. McMann then

---

[1] McMann testified that after the shooting, he became aware of a department report that Barnes was suspected of involvement in drug-related activities.

[2] It is undisputed "that the search of Barnes was conducted in a reasonable manner and at a suitable location. The uncontroverted evidence demonstrates that the officers acted very professionally and that Barnes was searched in a private area of the police station with only male officers present. Nor is there any suggestion that the officers had any improper motive for performing the search." Barnes, 443 F. Supp. 2d at 251.

instructed Barnes to turn around, bend over, and spread his buttocks so that the officers could see whether he had anything concealed in his anal area. Barnes refused to do so. McMann informed Barnes that it was station policy to conduct the body cavity search as part of the strip search and that the examination would only be visual.

At this point in the search, as McMann was explaining to Barnes that he had to submit to the visual cavity search, Detective Daniel Turgeon, a ten-year veteran of the narcotics unit, arrived at the strip search area. Turgeon testified that he had heard that Barnes was being brought in and that he wanted to ensure that Barnes was strip searched. He had received a tip from some sources that Barnes was reputed to deal in drugs and, specifically, known to "cheek" drugs -- i.e., conceal drugs between his buttocks.[3]

When Turgeon arrived at the strip search -- before Barnes submitted to the body cavity search -- he told McMann that "Mr. Barnes needed to be strip searched."[4] Turgeon also told Barnes that the cavity search "was protocol with the Police Department" and that he had to submit. After some discussion, Barnes reached

---

[3] Turgeon did not identify the informants or testify to any facts supporting their reliability.

[4] It is the policy of the Woonsocket Police Department that when conducting strip searches, "[p]risoners will be required to bend over and spread the rectum to provide a clear view of the area." We therefore consider Turgeon's instruction to strip search Barnes an order to also conduct a visual body cavity search.

behind his back and removed a bag containing cocaine base from between his buttocks. He then submitted to a visual cavity search, which uncovered no further drugs.[5]

Before the district court, McMann testified that he thought a strip search of Barnes, and implicitly a visual body cavity search, was warranted because (1) he suspected that Barnes was a drug dealer, (2) marijuana was found in the car, (3) Barnes had time to conceal drugs on his body when McMann stepped away from Barnes's car to inspect Barnes's papers, and (4) he knew that some drug dealers concealed drugs between their buttocks. He conceded that he did not have any specific information as to where Barnes kept drugs on his person.

The district court first held that the potential for Barnes to be carrying concealed drugs or a weapon on his person "clearly justified" McMann's decision to conduct a strip search. Barnes, 443 F. Supp. 2d at 253. The court went on, however, to determine that McMann conducted the visual body cavity search without reasonable suspicion. While recognizing that Turgeon had "information that Barnes was reputed to 'cheek' drugs," the court determined that the knowledge could not be imputed to McCann because it "was not communicated to Officer McMann before the

[5] The Government conceded that although the drugs were not produced as the direct result of a visual body cavity search, there was a "strong likelihood of that search impelled Barnes to surrender his drugs."

search was conducted." Id. McCann's knowledge, alone, was an insufficient basis to support a reasonable suspicion that Barnes had drugs concealed between his buttocks. Id. Specifically, the court opined that "it paints with too broad a brush to say that every person arrested on a drug charge automatically is subject not only to a strip search but also to a visual body cavity search[;] . . . more individualized suspicion . . . is required to extend the search to bodily cavities." Id. at 253-54.

**II. Discussion**

In an appeal from a suppression order, we review the district court's legal conclusions de novo. See Ornelas v. United States, 517 U.S. 690, 699 (1996). Subsidiary factual findings are reviewed for clear error, "giv[ing] due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id. "A clear error exists only if, after considering all the evidence, we are left with a definite and firm conviction that a mistake has been made." United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996). Clear error does not exist if "any reasonable view of the evidence supports the decision." Id.

"[T]he reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context . . . ." Swain v. Spinney, 117 F.3d 1, 7 (1st Cir. 1997). The suspicion must be specific to the individual being searched. Roberts v. Rhode Island, 239 F.3d 107, 110 (1st Cir. 2001) ("[O]fficers [must] have

a reasonable suspicion that a particular detainee harbors contraband prior to conducting a . . . visual body cavity search."). Moreover, in evaluating whether the suspicion was reasonable, we "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002)(internal quotation marks omitted); United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006) (grounding reasonable suspicion in "specific and articulable facts"). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them," but a "mere hunch" does not rise to reasonable suspicion. Arvizu, 534 U.S. at 273-74.

We will not disturb the district court's determination that McMann, standing alone, did not have reasonable suspicion to conduct a visual body cavity search of Barnes. The initial strip search for contraband and weapons was clearly justified given Barnes's arrest for a drug trafficking crime. See, e.g., Burns v. Loranger, 907 F.2d 233, 238-39 (1st Cir. 1990). However, a visual body cavity search involves a greater intrusion into personal privacy. See, e.g., Blackburn v. Snow, 771 F.2d 556, 561 n.3 (1st Cir. 1985) (distinguishing between strip searches and various types of body cavity searches). Accordingly, prior to conducting a visual body cavity search, we require a more particularized

suspicion that contraband is concealed. See Swain, 117 F.3d at 7 (requiring reasonable suspicion that the arrestee is concealing contraband or weapons). The evidence before McMann -- that Barnes was a suspected drug dealer in possession of narcotics and that some drug dealers conceal drugs between their buttocks -- did not endow him with an individualized suspicion that Barnes was "cheeking" drugs.

A visual body cavity search is not necessarily invalid because the knowledge held by the individual officer conducting the search is insufficient to support reasonable suspicion. We have recognized that reasonable suspicion or even probable cause can be established by the "collective knowledge" or "pooled knowledge" principle. See, e.g., United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986) (finding probable cause for arrest on the basis of collective knowledge) (internal citations omitted); United States v. Pardue, 385 F.3d 101, 106-07 (1st Cir. 2004), cert. denied, 543 U.S. 1169 (2005). Accordingly, the "focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." United States v. Fiasconaro, 315 F.3d 28, 36 (1st Cir. 2002) (quoting United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999)). Specifically, reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion. Burns, 907 F.2d at 236 n.7;

see also United States v. Taylor, 162 F.3d 12, 18 n.2 (1st Cir. 1998) (finding that information regarding an informant's reliability can be imputed between officers "cooperating in an investigation" (quoting United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997))). Likewise, in this case, Turgeon's statement to McMann that "Mr. Barnes needed to be strip searched" is sufficient to impute Turgeon's knowledge to McMann. Thus, the district court erred in failing to consider the knowledge held by Turgeon in evaluating McMann's subsequent order for Barnes to submit to the visual body cavity search.

Admittedly, Turgeon's statement to McMann came after McMann had (without reasonable suspicion) ordered Barnes to turn around, bend over, and spread his buttocks. Barnes, however, refused McMann's original order, and did not comply until after Turgeon had ordered him to submit to the visual body cavity search and McMann had reiterated his own order, following Turgeon's indication that the search was necessary. The illegality of McMann's original order only taints Turgeon's and McMann's subsequent orders if the challenged evidence "has been come at by exploitation of that illegality." Wong Sun v. United States, 371 U.S. 471, 488 (1963); see also Segura v. United States, 468 U.S. 796, 804 (1984). We think it clear that the narcotics were not discovered through the exploitation of McMann's illegal order. Indeed, Barnes refused to comply with McMann's original order. See

Segura, 468 U.S. at 815 ("[E]vidence will not be excluded as 'fruit' [of an illegal search] unless the illegal[] [search] is at least the 'but for' cause of the discovery of the evidence."). The narcotics were only discovered after Barnes chose to cooperate with Turgeon's and McMann's subsequent orders.[6]

The next question is whether Turgeon's knowledge was sufficient to endow him with the requisite reasonable suspicion to order a body cavity search. Although the district court determined that Turgeon had the necessary individualized knowledge that Barnes was reputed to conceal drugs between his buttocks, it did not explicitly discuss the merits of his information. See Barnes, 443 F. Supp. 2d at 253. The court noted only that Turgeon had such information. Id. On appeal, the government makes the argument that there was reasonable suspicion based solely on the information

---

[6] The district court properly held that although Barnes produced the drugs himself, "it is clear that he did so only because he recognized that, otherwise, [the search] would be performed." Barnes, 443 F. Supp. 2d at 253. Thus the issue is whether there was justification for such a search. To preserve his Fourth Amendment rights, Barnes was not required, after initially objecting to inspection, to continue to resist when confronted by the officials claiming valid authority. See Schneckloth v. Bustamonte, 412 U.S. 218, 233 (1973) ("[I]f under all the circumstances it has appeared that the consent was not given voluntarily -- that it was coerced by threats or force, or granted only in submission to a claim of lawful authority -- then we have found the consent invalid and the search unreasonable.") (citing Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)); United States v. Pérez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000) (requiring "more than mere acquiescence in the face of an unfounded claim of present lawful authority").

known to Turgeon. We cannot agree with the government on the basis of this record.

Reasonable suspicion can be based upon information from an informant if the tip bears sufficient "indicia of reliability." Adams v. Williams, 407 U.S. 143, 147 (1972). In order to determine reasonable suspicion, we must look to the "totality of the circumstances" and examine whether Turgeon had a "particularized and objective basis" for suspecting that Barnes was concealing narcotics between his buttocks. See Arvizu, 534 U.S. at 273-74. In making this evaluation, we are entitled to defer to an officer's knowledge gathered through years of experience to gauge the veracity of information. See id. Nonetheless, we are mindful that when scrutinizing whether an informant's tip provides reasonable suspicion, we must look to a number of factors, including the officer's familiarity with the informant and the past reliability of the informant, United States v. Montiero, 447 F.3d 39, 44 (1st Cir. 2006) (citing Williams, 407 U.S. at 146). Indeed, our "determination entails an examination of all the circumstances bearing upon the tip itself and the tipster's veracity, reliability, and basis of knowledge." United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004). Specifically, we have cautioned against an officer "indiscriminately credit[ing] gossip or innuendo." Id.

Here, Turgeon testified, generally, that his informants had been reliable sources in the past. Turgeon's testimony that the informants were known to the police does provide "some assurance of reliability." United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002) (noting that a known tipster "could be held responsible if his assertions proved inaccurate or false"). Indeed, where informants are known, a lesser degree of corroboration can be required. Compare Williams, 407 U.S. at 146-47 (upholding a Terry stop on the basis of an uncorroborated tip from a known and previously reliable informant), with Alabama v. White, 496 U.S. 325, 331-32 (1990) (justifying a Terry stop with an anonymous tip that was corroborated by details and predictive information). However, the record must provide sufficient information from which the court can ascertain and evaluate the tipster's "veracity, reliability, and basis of knowledge." Romain, 393 F.3d at 71; see, e.g., Taylor, 162 F.3d at 18 (affirming the district court's finding that an informant was reliable on the basis of record evidence describing the officer's relationship with and prior tips provided by the informant).

In this case, Turgeon's testimony is completely lacking in any factual detail regarding the informant's tip. Although it is undisputed that "[r]easonable suspicion is a less demanding standard than probable cause . . . [and] can arise from information that is less reliable than that required to show probable cause,"

White, 496 U.S. at 330, the law requires more than naked assertions of reliability to support reasonable suspicion. The hearing transcript reveals that Turgeon simply responded in the affirmative when briefly queried as to whether: (1) he had "information from sources in Woonsocket as to Mr. Barnes," (2) they "have been reliable sources," and (3) he had "received information as to where on his person Mr. Barnes carried his drugs." Turgeon provided no additional facts regarding his sources, the context in which the information was conveyed, or the information solicited from them. In the absence of such factual detail, we are unable to draw any conclusions regarding the informant's basis of knowledge -- whether the information was sufficient or credible to establish reasonable suspicion. See Romain, 393 F.3d at 71.

## III. Conclusion

Accordingly, we vacate the district court's order suppressing the cocaine base seized from the defendant and remand to determine the issue of Turgeon's reasonable suspicion. On remand, the court may, within its discretion, take additional evidence on the relevant factual issues as it appears that the original suppression hearing was erroneously focused by the court on the lack of express communication between the two officers. See, e.g., United States v. Ventura, 85 F.3d 708, 712 (1st Cir. 1996) (permitting the district court to take additional evidence where the court had previously applied an incorrect legal standard)

(citing United States v. Streifel, 781 F.2d 953, 962 (1st Cir. 1986) (leaving it within the district court's discretion to reopen and redetermine any issue covered in the appeal)).

**Vacated and Remanded.**